UNITED STATES of America,
Appellee,

v.

Harry R. CARBONI, Defendant–
Appellant.

Docket No. 98–1349

United States Court of Appeals,
Second Circuit.

Argued: Sept. 16, 1999
Decided: Feb. 18, 2000

Ronald S. Apter, Assistant United States Attorney, Hartford, CT (Stephen C. Robinson, United States Attorney for the District of Connecticut, New Haven, CT, on the brief), for Appellee.

Colleen P. Cassidy, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Defendant–Appellant.

Before: LEVAL, CABRANES, and POOLER, Circuit Judges.

POOLER, Circuit Judge

A jury convicted Harry R. Carboni of three counts of knowingly making false statements to secure advances on a line of credit in violation of 18 U.S.C. § 1014. Carboni seeks reversal of both the conviction and the resulting sentence, which principally consisted of a fifteen-month

term of imprisonment, three years of supervised release, and an order to pay restitution in the amount of $195,840. We affirm the conviction and all aspects of the sentence except the restitution order, which we vacate. We remand for resentencing on restitution.

## BACKGROUND

In late 1992 or early 1993, Cableco, Inc. ("Cableco"), a Connecticut distributor of wire and cable products, retained Carboni as a consultant to assist in diversifying Cableco's business operations by, among other things, establishing a new manufacturing plant to be known as North American Cable Co. ("NACC"). By Fall 1993, Carboni acted as the chief operating officer for Cableco and NACC and managed the financial affairs of both companies.

In June 1993, Fleet Bank ("Fleet") loaned Cableco $400,000 for NACC's startup costs. Fleet, Cableco, and NACC also entered into a revolving loan agreement pursuant to which Fleet, at its discretion and over the next two years, would loan Cableco a maximum of the lesser of $2,100,000 or the sum of (A) 80% of eligible accounts receivable and (B) 50% of qualified inventory. An account receivable was "eligible" within the meaning of the agreement only if Cableco had actually shipped the goods included in the account. "Qualified inventory" included only Cableco's inventory. To obtain advances, Cableco had to submit "borrowing base certificates" that included summary statements of its eligible accounts and qualified inventory. Besides assisting Fleet in determining whether to make new advances, accurate borrowing base certificates would demonstrate whether Cableco was "out of formula" as to existing loans. That is, the certificates would show whether Cableco had a higher loan balance than its qualified inventory and eligible accounts justified. If

the current borrowing base certificate did not support the existing loan balance, Fleet could require Cableco to repay the excess amount. If Cableco failed to comply, Fleet had the right to declare a default.

NACC's startup did not go smoothly. The new company quickly encountered financial difficulties that affected Cabelco, which directly funded NACC. In September, Fleet referred the loan and line of credit to Katherine Lord of its managed assets or "work-out" division for intensive management.

Around the same time, Cableco began to engage in deceptive practices that increased the amounts it could borrow under its line of credit. From September 1993 through January 1994, Cableco—at Carboni's direction—often pre-billed invoices, that is, it created invoices for items it had not yet shipped.[1] Cableco then included these pre-billed invoices as eligible accounts receivable in daily borrowing base certificates that Carboni periodically reviewed before their submission to Fleet. Carboni also directed the paper transfer of certain NACC assets to Cableco shortly after Lord, on December 14, 1993, denied Cableco's request to use NACC assets as collateral for advances. Thereafter, Cableco included the NACC assets in its borrowing base certificates.

Fleet discovered both the pre-billing scheme and the inclusion of NACC inventory in Cableco's inventory figures during the course of a February 1994 audit. Fleet's bank examiner, Peter Rutigliano, determined that Cableco received approximately $547,000 in advances that were not justified by its qualified inventory and eligible accounts receivable. Rutigliano testified that Cableco pre-billed certain accounts by as much as fifty-eight days and that the goods justifying other invoices were never shipped. On March 11, 1994,

1. Fleet's auditor, Peter Rutigliano, indicated that Fleet was aware of isolated instances of pre-billing prior to September 1993. However, these earlier invoices were pre-billed by only two days and "were completed and sitting on the dock" at the time the invoice was cut.

Fleet called the loan, which had an outstanding balance of approximately $1.6 million. After collecting on certain valid accounts receivable and receiving $478,000 from the Connecticut Development Authority, which guaranteed a portion of the debt, Fleet Bank had a net loss of approximately $674,230.

The grand jury indicted Carboni on July 29, 1997. A superseding indictment returned October 22, 1997, charged Carboni with three counts of knowingly making false statements to procure advances on its line of credit. Although the indictment referred to fraudulent base borrowing certificates issued as early as September 1993, the counts charged in the indictment rest exclusively on the borrowing certificates issued on December 17, 1993, January 5, 1994, and January 17, 1994. Fleet loaned Cableco $120,000 after December 17, 1993.

Prior to trial, the government gave notice that it intended to introduce evidence of uncharged conduct, Carboni's addition of fictional inventory to Cableco's perpetual inventory. The government claimed that Carboni created fictional inventory because he wanted to conceal a discrepancy between Cableco's perpetual inventory and its general ledger. As the fictional inventory could have affected the bank's lending decisions, the government contended that the uncharged acts were part of the same course of conduct described in the indictment. Carboni strenuously objected, arguing that the alterations to the perpetual inventory occurred long before NACC ran into financial trouble and there was no evidence that the fictional inventory played any part in influencing Fleet to make any loan or advance.

The district court concluded that the evidence was admissible because the additions to the inventory were part of a series of transactions that involved Fleet, Cableco, and Carboni and because the evidence tended to show Carboni acted purposefully rather than out of ignorance or mistake when he committed the charged conduct.

Carboni declined the district court's invitation to submit a limiting instruction. Both the government and the defense offered substantial testimony concerning the changes in the perpetual inventory.

At trial, a number of former Cableco employees including the company's comptroller, John Jablonski, implicated Carboni. Jablonski testified that Carboni knew about the pre-billed invoices and understood their effect on the base borrowing certificates. Much of Jablonski's testimony came in response to leading questions posed by the Assistant United States Attorney ("AUSA"). Without objection, Jablonski testified that pre-billed invoices created an inflated assets base and that he had conversations with Carboni in which Carboni indicated his awareness of pre-billing. After a question directed at discussions of pre-billed invoices at weekly staff meetings, Carboni's counsel objected that "we've passed into very much leading questions." The court overruled Carboni's objection. Although the prosecutor asked Jablonski other leading questions, Carboni made no further objections.

Carboni admitted creating a system for pre-billing invoices and adding NACC inventory to Cableco's inventory. He claimed, however, that he had no intent to mislead Fleet and explained that he transferred NACC's inventory to Cableco's books to protect Leone Giannitti, the owner of both companies, who had guaranteed payment for the transferred items, and implemented the pre-billing system "to overcome the burdensome, cumbersome, inefficient paperwork, to make sure that the product would be shipped and invoices cut in a timely fashion." Carboni claimed that invoices were generated based on projected shipping dates but acknowledged that the products invoiced were not always shipped by the projected date.

The jury convicted Carboni on all three counts, and the court sentenced him to fifteen months of imprisonment, three years of supervised release, and payment

of restitution in the amount of $195,840 in monthly payments of $250 subject to "adjustment based on income following the term of incarceration." On appeal, Carboni contends the district court erred by (1) admitting evidence of the change in the perpetual inventory; (2) allowing the government to use leading questions in eliciting Jablonski's testimony; (3) calculating the amount of loss to Fleet; and (4) inadequately explaining its reasons for the restitution award.

## DISCUSSION

### I. The Perpetual Inventory

 Federal Rule of Evidence 404(b) provides that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . . .

"We follow an inclusionary rule, allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994). The district court has wide discretion in making this determination, and we will reverse only for abuse of discretion. *See id.* Moreover, "evidence of uncharged criminal activity is not considered other crimes evidence under Fed.R.Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (internal quotation marks and indica-

tors of alterations from the original omitted).

 The district court did not err or abuse its discretion by admitting evidence that Carboni added fictional items to the perpetual inventory. First, the evidence supports the district court's view that the changes in the perpetual inventory were inextricably intertwined with the charged conduct and thus not subject to Rule 404(b). The additions to the perpetual inventory—which Carboni acknowledged making but claimed were necessary to address a computer glitch that undercounted the perpetual inventory—occurred at about the same time Cableco entered into the loan agreement. Moreover, Rutigliano testified that he met with Carboni during the September audit and Carboni did not mention or explain the discrepancy between the general ledger and the perpetual inventory. The jury reasonably could have concluded that Carboni altered the perpetual inventory as part of his continued effort to create an overly optimistic picture of Cableco's financial system and thus keep the money flowing from Fleet to the troubled company. Even if the perpetual inventory evidence had been subject to Rule 404, the court correctly admitted the evidence because it tended to rebut Carboni's contention that he acted in good faith when he caused false base borrowing certificates to be submitted to Fleet. *See Inserra*, 34 F.3d at 89 (finding that district court did not abuse its discretion in admitting evidence of prior conviction for similar act when defendant asserted good faith defense). Although Cableco's accountant advised Carboni to delete the fictional parts from both the perpetual inventory and the general ledger, Carboni rejected his advice. Carboni's failure to comply when his accountant advised him to delete the fictional inventory makes it less likely that he believed pre-billing and addition of NACC inventory to Cableco's books reflected sound accounting practices. Because Carboni vigorously pursued a good faith defense, the relevance of this testimony outweighed any attendant prejudice.

## II. The Jablonski Testimony

■ All three counts of the indictment alleged violations of 18 U.S.C. § 1014, which prohibits "knowingly mak[ing] any false statement ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation." Carboni urges that the district court erred by allowing the government to ask leading questions to elicit Jablonski's testimony that Carboni knew about pre-billing, especially because Jablonski gave the only direct evidence on this issue.

■ Federal Rule of Evidence 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Ordinarily, we review the district court's determination to allow leading questions for abuse of discretion. *See United States v. Salameh*, 152 F.3d 88, 127–28 (2d Cir.1998). However, the government argues for a plain error standard of review because Carboni objected to only one of the government's questions as leading and did so belatedly. Carboni responds that his one objection was made to the entire line of leading questions. We need not resolve this issue because the district court did not abuse its discretion. Defense counsel objected to the government's questions only after they had elicited significant information concerning Carboni's knowledge of pre-billing and its effect on the borrowing base certificates. More important, the government posed the question to which Carboni objected only after it repeatedly attempted to elicit the same information through non-leading questions. The AUSA first asked, "What was discussed at the meetings?" When Jablonski responded that they discussed production and shipments, the AUSA asked whether Jablonski referred to anticipated shipments. Jablonski responded, "yes," but then returned to the issue of production. The AUSA then asked, "What else did you discuss?" Only after Jablonski returned to "the same point, what impact this had for your monthly results and your year-to-date results," did the AUSA ask the objected-to leading question. At this point, leading questions arguably were "necessary to develop the witness' testimony," so the district court did not abuse its discretion by allowing them. *Salameh*, 152 F.3d at 128 (quoting Fed.R.Evid. 611(c)).

■ Even if the district court's decision to allow leading questions had been erroneous, the resulting error would have been harmless, *see* Fed.R.Crim.P. 52(a), because overwhelming evidence apart from Jablonski's testimony proved Carboni's guilty intent. Denise Treglia, the clerical worker who created the pre-billed invoices and maintained them in a folder in .her desk, testified that Bill Hale took the folder of pre-billed invoices into weekly meetings with Giannitti and Carboni. Virginia Burka, Cableco's bookkeeper, suggested that Carboni was responsible for creating the pre-billed invoices because he was "the person who was responsible for all of the issuing of what was to be billed." Burka also testified that Carboni reviewed the borrowing base certificates. Mike Mayfield, NACC's president, testified that Carboni directed him to move NACC inventory from NACC's books and "sell it" to Cableco although the materials didn't actually leave the NACC facility and were eventually consumed by NACC. Finally, the timing of the inventory transfer and of certain substantial pre-billings was suspicious in itself. Carboni caused raw materials to be transferred from NACC's inventory to Cableco's inventory shortly after Lord refused a request from him to borrow based on NACC's inventory. Then, within two days of the second invoice evidencing the phony transfers, Cableco took a $120,000 advance, 50% of the asserted value of the inventory. Similarly, Cableco pre-billed two large invoices totalling over $130,000 on December 15, 1993, and drew down on its line of credit by $125,000 the next day.

## III. Sentencing Issues

### A. Offense Level

At sentencing, the district court assigned a total offense level of fourteen to Carboni. Starting from a base offense level of six, see U.S.S.G. § 2F1.1(a), the court (1) adjusted upward two levels for more than minimal planning, see U.S.S.G. § 2F1.1(b)(2); (2) adjusted upward seven levels based on the court's determination that Carboni had caused Fleet to lose $195,840, see U.S.S.G. § 2F1.1(b)(1)(H); and (3) departed downward one level pursuant to U.S.S.G. § 5K2.0. On appeal, Carboni claims that the seven-level upward adjustment was in error because the court did not limit its calculation to actual loss caused by Carboni's conduct.

The district court acknowledged that determining the portion of Fleet's loss that should be attributed to Carboni was "very problematic" because Fleet knowingly tolerated some pre-billing at the beginning of its relationship with Cableco and Cableco ultimately shipped most of the pre-billed products. In an effort to resolve this problem, the court focused on two flagrant misstatements. It found that the first—the paper transfer of the NACC raw materials to Cableco—resulted in an $80,000 advance that would not otherwise have been made. The district court also relied on the January 5, 1994, pre-billing of $144,800 on a contract with Kirkland Air Force Base ("Kirkland") because the pre-billed invoice "clearly did not have either a catch-up collateral when product was shipped or [was] not otherwise able to be remedied." Although the court did not find that Fleet made further advances based on the Kirkland pre-billing, the court included the entire amount that could have been advanced, $115,840, in the amount of loss attributable to Carboni.

Carboni argues that the district court (1) had no sound basis for calculating Fleet's loss because Fleet provided no written documentation; (2) erred by finding a loss greater than the funds advanced after Ca-

bleco submitted the first of the statements for which Carboni was convicted; (3) should have deducted $100,000 that Fleet recovered from the sale of off-balance sheet inventory as well as amounts the bank could have recovered from Giannitti; and (4) erred by combining actual loss from the inventory misstatement and potential loss from the Kirkland misrepresentation.

 We review the district court's factual findings on loss for clear error and its conclusions of law de novo. See United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997). The district court need not establish the loss with precision but rather "need only make a reasonable estimate of the loss, given the available information." Id. (internal quotation marks omitted).

 Carboni questions the district court's factual findings, arguing there was no proof of actual loss to the bank. However, Carboni concedes that the balance owed on Fleet's loan before the recovery of any assets was $674,230. His only specific challenge is to the district court's failure to deduct from that balance the approximately $100,000 that Fleet collected from off-balance-sheet inventory as well as unknown amounts that Fleet might have been able to recover from Giannitti's assets. A Fleet officer testified that Fleet did not pursue Giannitti's assets because of the cost of litigation in the face of a claim from another individual. Both the cost of litigation and the uncertainty of success made any recovery from Giannitti speculative. Therefore, the district court did not err by failing to deduct the unknown value of Giannitti's assets from Fleet's loss. Although Fleet did recover approximately $100,000 from the sale of the off-balance-sheet assets, deduction of this amount from Fleet's net loss of $674,230 leaves $574,230. The district court did not clearly err by attributing $195,840 of that amount to Carboni's most flagrant misrepresentations.

■ We also reject Carboni's claim that the countable loss to Fleet cannot exceed $120,000, the amount advanced after the date of the first offense of conviction, because the court in "determining the amount of loss for purposes of calculating the offense level for a fraud, [must] include 'all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. McCormick*, 993 F.2d 1012, 1013 (2d Cir.1992) (quoting U.S.S.G. § 1B1.3(a)(2)).

■ Carboni also argues that the district court erred by combining the actual loss stemming from the inventory misrepresentations with the potential loss stemming from the Kirkland misrepresentation. Application note 8(b) to U.S.S.G. § 2F1.1 provides that

[i]n fraudulent loan application cases ..., the loss is the actual loss to the victim.... For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

"Intended loss" is tantamount to the probable loss from a particular misstatement "because one is presumed to intend the natural and 'probable' consequences of one's acts." *Jacobs*, 117 F.3d at 95. Here, the defendant made several fraudulent misrepresentations concerning the value of the bank's collateral. The district court found that one of these misrepresentations resulted in an $80,000 loss to Fleet, and the Kirkland pre-billing probably would have resulted in an additional $125,000 loss if Fleet had made more advances. Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose. Therefore, the district court correctly added the actual loss from the first misrepresentation to the amount the bank would have lost had it acted in reliance on the second misrepresentation.

## B. Restitution

■ Although the district court did not err in calculating Fleet's loss for purposes of setting the offense level, we must separately analyze loss with respect to the restitution order because a court's power to order restitution is limited to actual loss. *See United States v. Germosen*, 139 F.3d 120, 130 (2d Cir.1998) (citing, *inter alia*, 18 U.S.C. § 3663(a)(1)(A)), *cert. denied*, — U.S. —, 119 S.Ct. 829, 142 L.Ed.2d 686 (1999). The district court's restitution order, which directs payment of restitution in the same amount the court used in its offense level calculations, almost certainly includes potential loss from Carboni's misrepresentation about the Kirkland contract. Therefore, we vacate that award and remand for resentencing.

■ On remand, the court must consider the factors that are mandatory in setting restitution. These include the "financial need ... of ... the defendant's dependents." 18 U.S.C. § 3663(a)(1)(B)(i). We note that the presentence report suggests that, at least during Carboni's incarceration, his wife might not have sufficient funds to maintain her household. The court's failure to mention this in its original consideration of restitution suggests that the court may have failed to consider the mandatory factors. Especially if the district court decides on remand to impose a restitution obligation during the period of Carboni's incarceration, it should make clear on the record that it has considered the factors required by the statute. *See United States v. Tortora*, 994 F.2d 79, 81 ( 2d Cir.1993).

## CONCLUSION

Carboni's conviction and all aspects of his sentence except the award of restitu-

tion are affirmed. We vacate the restitution order and remand for further proceedings in accord with this opinion.