06-1595-cr
United States v. Figueroa

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: October 18, 2007      Decided: November 18, 2008)

Docket No. 06-1595-cr

------------------------------------

UNITED STATES OF AMERICA,

Appellee,

- v -

EDWIN FIGUEROA,

Defendant-Appellant.

------------------------------------

Before:  KEARSE, SACK, and HALL, Circuit Judges.

Appeal by the defendant, Edwin Figueroa, from a judgment of conviction against him in the United States District Court for the Western District of New York (David G. Larimer, Judge) for unlawfully possessing a firearm.  At trial, the district court prohibited defense counsel from cross-examining a government witness about his swastika tattoos despite the fact that the defendant was a member of a minority group.  We conclude that, although the trial court's ruling was a violation of Figueroa's rights under the Confrontation Clause of the Sixth Amendment, the error was harmless.

Affirmed.

JON P. GETZ, Muldoon & Getz, Rochester, NY, for Appellant.

JOSEPH J. KARASZEWSKI, Assistant United States Attorney (Terrance P. Flynn, United States Attorney for the Western District of New York), Buffalo, NY, for Appellee.

SACK, Circuit Judge:

Defendant Edwin Figueroa appeals from a judgment of the United States District Court for the Western District of New York (David G. Larimer, Judge), following a jury trial, convicting him of unlawful possession of a firearm.[1]  At trial, the district court ruled that the defendant's counsel could not cross-examine a government witness about his swastika tattoos.  We conclude that this restriction on the scope of cross-examination was a violation of the Confrontation Clause of the Sixth Amendment.  We affirm the conviction, however, because we also conclude that the error was harmless.[2]

**BACKGROUND**

On January 26, 2004, Figueroa, then a New York State parolee, resided in Rochester, New York.  He lived in an apartment building with two apartment units.  On that date, New

---

[1] Figueroa was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); possessing a firearm having a barrel less than sixteen inches in length in violation of 26 U.S.C. §§ 5822, 5845(a)(3), 5861(c) and 5871; and possessing an unregistered firearm with a barrel less than sixteen inches in length in violation of 26 U.S.C. §§ 5845(a)(3-4), 5861(d) and 5871.

[2] We address Figueroa's remaining claims in a summary order filed today.

-2-

York State parole officers received a complaint from one Rick Kerezman, who lived in the apartment adjacent to Figueroa's, that Figueroa was drinking alcoholic beverages and using drugs in his apartment, and that he had discharged a firearm there. Because such behavior would violate Figueroa's conditions of parole, the officers decided to conduct an unannounced search of Figueroa's residence later that day.

The Search

When the parole officers arrived, Figueroa was slow to answer the door. After the parole officers knocked, they saw a shadow pass in front of a window. Some five minutes later, Figueroa opened the door and the parole officers began their search. They discovered a spent .22-caliber shell-casing on Figueroa's living-room floor. Figueroa told them that "John" had recently fired a gun in his apartment. He said he had told "John" to leave.[3]

Continuing their search, the parole officers passed through Figueroa's apartment and into a common interior hallway that connected the building's two apartment units. There they found a sawed-off .22-caliber rifle just outside Figueroa's apartment. The officers notified the Rochester city police, who arrested Figueroa and seized the gun and shell-casing. Figueroa told the police that his fingerprints were on the gun, but that

_____

[3] The district court denied Figueroa's motion to suppress this and two other statements he made to law enforcement officers. As we explain in our accompanying summary order, we find no error in that decision.

-3-

he had never fired it. He also told them that he was with a friend when the gun was purchased but that he did not know how the gun got into his house. A ballistics expert later determined that the spent shell-casing recovered from Figueroa's living room was fired from the rifle found in the hallway.

The Evidence at Trial

On June 29, 2004, Figueroa was indicted by a federal grand jury in the Western District of New York for unlawfully possessing the rifle. On October 3, 2005, a jury trial on the charges began in the United States District Court for the Western District of New York. Parole officers and police officers testified to the events described above.

In addition, Frank Keough, Figueroa's roommate, testified that Figueroa had told Keough that Figueroa wanted a weapon for personal protection. On the morning before his arrest, Keough said, Figueroa told him that he had obtained a weapon. Figueroa showed Keough the sawed-off rifle that was later recovered from the hallway. Keough acknowledged that he had a felony conviction and that he was addicted to drugs and alcohol. He testified that he had met Figueroa through their neighbor, Kerezman.

April Fouquet, Kerezman's girlfriend and the occupant of an apartment adjacent to Figueroa's, testified that she was at home when the parole officers searched Figueroa's apartment. When they knocked on his door, she heard him running around his apartment. The door of her apartment, which opens onto the

-4-

common interior hallway, was ajar. Fouquet, peeking through the opening, saw Figueroa exit his apartment holding the rifle, which he placed in the hallway. Figueroa then "turned around, closed the door and proceeded to run through [his] apartment" to open the front door for the parole officers. Trial Transcript, <u>United States v. Figueroa</u>, No. 04-cr-6106 (W.D.N.Y. Oct. 5, 2005) ("Trial Tr.") at 245-46. Fouquet acknowledged that she had previously been convicted of welfare fraud. She also testified that Figueroa and Kerezman were former roommates who had had a falling out -- culminating in a physical fight -- a few weeks before the events that led to Figueroa's arrest.

Jonathan Wright, another acquaintance of Figueroa, testified that he purchased the rifle at issue in December 2003 while shopping at a Wal-Mart with Figueroa and Kerezman. Like Keough, Wright came to know Figueroa through Kerezman. Wright testified that he sold the rifle to Figueroa about one week before Figueroa was arrested in exchange for fifty dollars and some clothing. He asserted that at the time of the sale to Figueroa the rifle's barrel was not "sawed off."

The defense called two witnesses: Figueroa's landlord, Nicholas Petrillo, and Figueroa's sister, Marisol Figueroa. Petrillo testified that after Figueroa was arrested, Kerezman asked if he could rent Figueroa's apartment. Marisol Figueroa testified that she, with other relatives, was in her brother's apartment two days before his arrest. Wright, the initial purchaser of the rifle, was also present and behaving

-5-

suspiciously: "pacing back and forth," "going in and out" of the apartment. Trial Tr. 360. Wright was "up to something," she said. Id.

Figueroa did not testify in his own defense.

<u>Swastika Tattoos</u>

Before Jonathan Wright testified, defense counsel informed the court that Wright had swastikas tattooed on his body. Counsel said that he intended to cross-examine Wright about them. Counsel argued, among other things, that Figueroa was a member of a racial or ethnic minority; that the testimony would be used to impeach Wright as to his bias and credibility; and that Figueroa had a right to the proposed line of cross-examination under the Confrontation Clause of the Sixth Amendment. Defense counsel also argued that the tattoos could be connected to Wright's affiliation with a gang, although counsel conceded that he had no information as to whether Wright was a member of a gang.

The government objected to the proposed cross-examination, arguing that the tattoos were relevant to Wright's "belief system" but were "not in any way connected to credibility or motive to lie in this particular case." Trial Tr. 282.

The district court denied Figueroa's request to cross-examine Wright about the tattoos or possible gang affiliation.

I'm not going to allow questioning of the witness about his . . . tattoo swastikas.
Also, there's been no proffer or anything other than a guess that he might belong to

-6-

some gang or organization. I think that's an impermissible question, too, without having a better foundation.

Generally [Rule] 608 [of the Federal Rules of Evidence] precludes use of -- or precludes attempts to show that a witness has a bad character, unless it relates to truthfulness, [or is] probative of truthfulness or untruthfulness, and I don't think the fact a person has a tattooed swastika speaks to that.

I mean, it just kind of attempts to attack the character of a witness. . . .

And I found no case that says because someone has a swastika tattoo, that he's more likely to be untruthful. . . .

. . . .

So if it's meant to show this man has a bad character because he has a swastika and may have some affinity toward people who follow that cause, I think that's just character evidence, which I don't think is admissible and I don't think this wearing of a tattoo goes to truthfulness or untruthfulness. I don't think it comes under 608(a) or (b).

So I'll deny the request to examine this witness about tattoos or gang membership based on the proffer I received so far.

Id. at 283-84.

### Verdict and Judgment

On October 6, 2005, the jury returned a guilty verdict on all counts. On March 30, 2006, the district court entered the judgment of conviction.

Figueroa appeals.

## DISCUSSION

### I. Standard of Review

"Only when th[e] broad discretion [of the district court] is abused will we reverse [the] court's decision to

-7-

restrict cross-examination." United States v. Crowley, 318 F.3d 401, 417 (2d Cir.), cert. denied, 540 U.S. 894 (2003). The district court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision –- though not necessarily the product of a legal error or a clearly erroneous factual finding –- cannot be located within the range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted).

## II.  Figueroa's Confrontation Clause Claim

The district court prohibited Figueroa's counsel from pursuing two lines of cross-examination of government witness Jonathan Wright: (1) Wright's possible gang affiliation, and (2) his swastika tattoos.  Figueroa argues that the district court thereby violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

### A.  Legal Standards

The Confrontation Clause guarantees a criminal defendant the right to cross-examine government witnesses at trial.  See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .").  "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974).

One way of discrediting a witness is "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id. "The motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination." Henry v. Speckard, 22 F.3d 1209, 1214 (2d Cir.), cert. denied, 513 U.S. 1029 (1994).

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.

Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (internal quotation marks and ellipsis omitted).

"It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." Id. at 679. District courts may "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. "Only when this broad discretion is abused will we reverse a

-9-

trial court's decision to restrict cross-examination." Crowley, 318 F.3d at 417.

B. Gang Affiliation

We conclude that the district court did not abuse its discretion in restricting Figueroa's cross-examination of Wright regarding his possible gang affiliation. "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts." United States v. Katsougrakis, 715 F.2d 769, 779 (2d Cir. 1983), cert. denied, 464 U.S. 1040 (1984). Here, defense counsel acknowledged that he had no information as to whether Wright was affiliated with a gang. The district court therefore properly ruled that Figueroa had not laid a proper foundation to question Wright on this subject.[4]

C. Swastika Tattoos

We think that the district court abused its discretion, however, when it ruled that Figueroa could not cross-examine Wright about his tattoos. The record reflects that the defendant is a member of a racial or ethnic minority group. Wright, who testified against Figueroa, bore two tattoos depicting swastikas. Inasmuch as the tattoos suggested that Wright harbored animus

---

[4] Defense counsel did not request permission to voir dire the witness outside the presence of the jury in an effort to establish a foundation for his proposed inquiry.

against racial or ethnic minority groups and their members, they were relevant to and probative of Wright's credibility, bias, and motive to lie when testifying against Figueroa.

The Confrontation Clause protects the right to "engag[e] in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Van Arsdall, 475 U.S. at 680. As we recently stated, "It is hard to conceive of a more 'prototypical form of bias' than racial bias." Brinson v. Walker, No. 06-0618, draft slip op. 10, ___ F.3d ___, ___, 2008 WL _____, at *__, 2008 U.S. App. LEXIS ____, at *___ (2d Cir. Nov. 13, 2008). And "racial bias, at least when held in extreme form, can lead people to lie or distort their testimony, and therefore might bear on the accuracy and truth of a witness' testimony, even though the bias is directed generally against a class of persons and not specifically against the accused." Id. at 11, ___ F.3d at ___, 2008 WL _____, at *__, 2008 U.S. App. LEXIS ____, at *___ (citation and internal quotation marks omitted).

It was apparently, and understandably, assumed by the district court and the parties that the swastika is commonly associated with white supremacism and neo-Nazi groups harboring extreme forms of racial, religious and ethnic hatred and prejudice against minority groups, including that to which Figueroa assertedly belongs.[5] The fact that a witness

---

[5] See Anti-Defamation League, Hate on Display: Extremist
(continued...)

-11-

customarily carries or displays a swastika, as a tattoo or otherwise, therefore would tend to suggest that he or she holds racial, religious or ethnic prejudices.  That in turn suggests a basis on which the jury could find the witness's testimony not credible.

"[T]he jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. 45, 52 (1984).  In a criminal trial, a witness wearing or bearing a swastika should

---

[5](...continued)
Symbols, Logos, and Tattoos, online version available at http://www.adl.org/hate_symbols/ (last visited Sept. 1, 2008). The ancient symbol of the swastika has for some ninety years been recognized as a symbol of National Socialism and the "Third Reich."

> I myself, meanwhile, after innumerable attempts, had laid down a final form; a flag with a red background, a white disk, and a black swastika in the middle.  After long trials I also found a definite proportion between the size of the flag and the size of the white disk, as well as the shape and thickness of the swastika.
>
> And this remained final.
>
> Along the same lines arm-bands were immediately ordered for the monitor detachments, a red band, likewise with the white disk and black swastika.
>
> The party insignia was also designed along the same lines: a white disk on a red field, with the swastika in the middle.  A Munich goldsmith by the name of Füss furnished the first usable design, which was kept.

Adolf Hitler, Mein Kampf, 496 (Ralph Manheim trans., Houghton Mifflin Co. 1999) (1926).

ordinarily be subject to cross-examination on credibility grounds where a jury might reasonably infer that the symbol indicated likely bias against the defendant.[6]

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. The government argues that the district court did not abuse its broad discretion in this instance. We disagree.

In federal courts, limits on the admission of relevant testimony are largely governed by Rule 403 of the Federal Rules of Evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of

---

[6] There may, of course, be occasions when it is contested whether the defendant is, or is perceived to be, a member of a racial or religious minority group targeted by white supremacist groups associated with the swastika symbol. There may also be cases in which the witness bearing the swastika is not in fact a sharer of a creed or a committed member of an organization preaching or practicing racial or religious prejudice or hatred. See, e.g., Sarah Boxer, A Symbol of Hatred Pleads Not Guilty, N.Y. Times, July 29, 2000, at B11 ("Before the Nazi party adopted the swastika and turned it into the most potent icon of racial hatred, it traveled the world as a good luck symbol. It was known in France, Germany, Britain, Scandinavia, China, Japan, India and the United States. Buddha's footprints were said to be swastikas. Navajo blankets were woven with swastikas. Synagogues in North Africa, Palestine and Hartford were built with swastika mosaics."). It may therefore be appropriate for a district court, if asked to do so, to hear evidence outside the presence of the jury before making an assessment as to the relevance of a tattoo or similar display of or association with the symbol.

unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. In this case, however, the district court did not purport to exclude the proffered cross-examination under Rule 403. It did not conclude that the cross-examination would be unduly prejudicial, confusing or misleading to the jury, or cumulative. The court based its decision solely on the ground that the proposed cross-examination was designed to elicit "character" evidence inadmissible under Rule 608 of the Federal Rules of Evidence.[7]

We think the district court thereby erred as a matter of law. The Supreme Court has held that impeachment for bias is admissible under Rule 402[8] even when the impeachment material is

---

[7] Rule 608 provides, in pertinent part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608(b).

[8] Rule 402 provides, in pertinent part: "All relevant evidence is admissible, except as otherwise provided by the
(continued...)

not independently admissible under Rule 608 as "concerning [the witness's] character for truthfulness or untruthfulness," Fed. R. Evid. 608. See Abel, 469 U.S. at 51, 55-56 & n.4.[9] Here, as in Abel, the purpose of the proposed line of cross-examination was not to show the witness's "character for truthfulness or untruthfulness," Fed. R. Evid. 608; it was to impeach the witness for bias.

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might

---

[8](...continued)
Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." Abel, 469 U.S. at 51.

[9]

> It seems clear to us that the proffered [extrinsic] testimony with respect to [the witness's] membership in [a hate group] sufficed to show potential bias in favor of [the defendant]; because of the tenets of the organization described, it might also impeach his veracity directly. But there is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case. It would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar.

Abel, 469 U.S. at 56.

> lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant . . . .

Abel, 469 U.S. at 52. Because the jury could have found that Wright's tattoos were indicative of bias, examination of him on that subject matter was relevant irrespective of its admissibility vel non under Rule 608. See id. at 55-56.[10]

"A district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100 (1996); see also Zervos, 252 F.3d at 169 ("A district court [abuses its discretion] when . . . its decision rests on an error of law (such as application of the wrong legal principle) . . . ."). The district court therefore abused its discretion in restricting Figueroa's cross-examination because its decision rested on a legally erroneous application of Rule 608.

As noted, the district court did not purport to exclude the proposed line of questioning under Rule 403. "Because we review a Rule 403 decision for abuse of discretion, and since the district court did not exercise its discretion on this basis or engage in a balancing process that we can review, we have no

_____

[10] Although Abel did not involve the Confrontation Clause because the witness impeached for bias in that case testified for the defense, we see no reason why that distinction would prevent us from applying its holding that evidence of potential bias that is admissible under Rule 402 need not be independently admissible under Rule 608.

-16-

occasion to decide whether the [evidence was] properly excluded under the Rule." United States v. Colomb, 419 F.3d 292, 302 (5th Cir. 2005) (citation omitted); accord United States v. Peak, 856 F.2d 825, 834 n.6 (7th Cir.) ("[T]he district judge did not invoke Rule 403 to justify his evidentiary ruling. This court, therefore, cannot review the ruling on Rule 403 grounds."), cert. denied, 488 U.S. 969 (1988). Based on the proverbial cold record before us, the reasons the court excluded the relevant tattoo evidence seem relatively modest compared to the Rule 403 factors favoring admissibility. But the written record is cold indeed. We therefore express no opinion as to whether, had the district court prohibited the proposed line of questioning under Rule 403, it would have been acting in the exercise of its sound discretion.

We conclude that the district court's prohibition on cross-examination for bias on the grounds upon which it relied violated Figueroa's confrontation rights under the Sixth Amendment.

III. Harmless Error Analysis

It does not necessarily follow from our conclusion that Figueroa's Sixth Amendment rights were infringed that his conviction must be reversed. "[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." Van Arsdall, 475 U.S. at 684. We will affirm the judgment of the district court if we are satisfied

-17-

"beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman v. California, 386 U.S. 18, 24 (1967).

> Whether such an error is harmless in a particular case depends upon a host of factors . . . .  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Van Arsdall, 475 U.S. at 684; see also Henry, 22 F.3d at 1215-16. We are persuaded beyond a reasonable doubt that the Confrontation Clause error in this case did not contribute to the jury's verdict.

Wright was not the only witness who saw Figueroa in possession of the sawed-off rifle.  Keough, Figueroa's roommate, testified that Figueroa had shown him "a black shotgun [that] appeared to be cut off," and that this weapon matched the weapon that the government showed him at trial.  And Fouquet, Figueroa's neighbor, testified that she had seen a bullet hole in the wall of Figueroa's apartment.  She also testified that she saw Figueroa put the rifle in the hallway after the parole officers knocked on his front door.  The parole officers corroborated Fouquet's account, testifying that they waited several minutes before Figueroa opened the door.  Any cross-examination of Wright as to his tattoos would have been unlikely to affect the credibility of Keough and Fouquet.  And the physical evidence

relating to the gun, too, was consistent with the testimony of Wright, Keough, and Fouquet: Officer Jenkins found a spent .22 caliber shell casing on the living room floor of Figueroa's apartment, and according to the firearms expert who testified at trial, that shell casing had been fired from the rifle that the officers discovered in the hallway. Therefore, even if Wright's credibility had been undermined by cross-examination regarding his swastika tattoos and related bias, the remainder of the government's case was overwhelming.[11]

The district court's Confrontation Clause error contributed to the guilty verdict in this case only if the jury convicted Figueroa based substantially on Wright's unimpeached testimony while ignoring or discrediting the testimony of Keough and Fouquet, which was supported by physical evidence. Our review of the record convinces us that that is highly improbable. We therefore conclude "beyond a reasonable doubt that the error complained of," Chapman, 386 U.S. at 24 -- the district court's refusal to permit Figueroa to impeach Wright's testimony by

_____

[11] Figueroa had other opportunities to cross-examine witnesses (including Wright) for bias. The evidence reflects that Wright, Keough, and Fouquet were all linked to Kerezman, who had an altercation with Figueroa shortly before the events that led to his arrest. Because Figueroa's possession of the rifle was independently established by the testimony of Wright, Keough, and Fouquet, Figueroa's most plausible defense theory was that these witnesses somehow conspired to frame him. Figueroa was able to pursue that defense theory at trial by cross-examining those three witnesses for bias stemming from their relationship with Kerezman and Kerezman's fight with Figueroa. It appears the jury did not discredit their testimony based on that line of questioning.

cross-examining him about his swastika tattoos -- "did not contribute to the verdict obtained," id. The district court's error was therefore harmless.

**CONCLUSION**

For the foregoing reasons, and for the additional reasons stated in an accompanying summary order addressing other issues raised by Figueroa on appeal, the judgment of the district court is affirmed.