*U.S. v. Cardenas*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2025

(Argued: January 14, 2026    Decided: February 18, 2026)

Docket No. 24-2734

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

JEY JAMES ROLDAN CARDENAS, AKA Miller de Jesus Gutierrez Duran,

*Defendant – Appellant*,

MAURICIO RENE GARCIA QUIMBAYO, AKA Tony, AKA Maurice, CLAUDIA ISABEL MERCADO SCALZO, AKA La Flaca, TATIANA ANDREA VARGAS BULLA, AKA Tati, AKA Tonia, AKA Tonya, OSCAR GOMEZ ROMERO, AKA Compa, JOSE ALFREDO AGUAS OVIEDO,

*Defendants*.[*]

Before:    CARNEY, PARK, and ROBINSON, *Circuit Judges*.

---

[*] The Clerk of Court is respectfully directed to amend the caption as reflected above.

Defendant-Appellant JEY JAMES ROLDAN CARDENAS ("Roldan") appeals from a judgment of the United States District Court for the Southern District of New York (Kaplan, *J.*), entered after a jury trial, convicting him of one count of conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B).

Although Roldan, a patrol-level police officer in Colombia, did not dispute that he participated in communications about a proposed cocaine export scheme, he contended that he lacked criminal intent because he believed he was helping the Colombian National Police ("CNP") arrange a seizure of the cocaine. On appeal, Roldan challenges the district court's exclusion of undisputed evidence that the fellow CNP officer who recruited him into the scheme actually *did* have relevant experience assisting the CNP in successful drug seizures.

We conclude that the district court erred in excluding the challenged evidence. The evidence tended to corroborate Roldan's testimony about key conversations with his colleague that were directly relevant to his state of mind. Further, the evidence was not barred by Federal Rule of Evidence 404(b). Because Roldan's defense turned on whether he had criminal intent and because a jury could credit his evidence on this point, the error wasn't harmless. Accordingly, we **VACATE** the judgment of conviction and **REMAND** for further proceedings consistent with this opinion.

———————

ALEXANDER LI, Assistant United States Attorney (Sarah L. Kushner, Olga I. Zverovich, Assistant United States Attorneys, *on the brief*), *for* Jay Clayton, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

ALLEGRA GLASHAUSSER, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, *for Defendant-Appellant*.

———————

ROBINSON, *Circuit Judge*:

Defendant-Appellant Jey James Roldan Cardenas ("Roldan") appeals from a final judgment of conviction entered in the United States District Court for the Southern District of New York (Kaplan, *J.*) following a jury trial, convicting him of conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B). The district court sentenced Roldan principally to 165 months' (nearly 14 years') incarceration, to be followed by a five-year term of supervised release.

Roldan, a patrol-level police officer in Colombia, does not dispute that he participated in communications with Isidro Vargas—a paid confidential informant for the United States Drug Enforcement Administration ("DEA") posing as an international drug trafficker—about exporting cocaine to the United States. Roldan contends, however, that he did so to help his coworker in the Colombian National Police ("CNP"), Jose Alfredo Aguas Oviedo ("Aguas"), set up a drug seizure. Consistent with that understanding, Roldan's defense at trial was that he lacked the requisite criminal intent to join the charged conspiracy because he believed he was assisting in an anti-narcotics operation directed *at* Vargas, rather than joining a drug-trafficking conspiracy *with* him.

3

Among other issues, Roldan challenges the district court's exclusion of undisputed evidence that Aguas had previously twice assisted the CNP's anti-narcotics unit by providing information that led to drug seizures. Roldan argues that the excluded evidence tended to corroborate his testimony that Aguas told him that Aguas made money by providing tips to the CNP, based on information given to him by sources, that led to seizures of drugs and then taking part of the reward money paid to the sources. Roldan contends that the district court exceeded its discretion in excluding the evidence and the error wasn't harmless because it went to the heart of his defense.

We agree. Accordingly, we **VACATE** and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

Below, we summarize the trial record before turning to the pretrial ruling at the center of this appeal.

### I. The Trial

#### A. The Government's Evidence

The government's theory was that Roldan engaged in a conspiracy to smuggle drugs from Colombia to the United States by leveraging a "network of corrupt associates" who "controlled every part of the [Cartagena] airport,"

4

including the control towers, camera systems, and forklifts. App'x 58. As relevant here, the government introduced the following evidence.

DEA informant Vargas posed as a drug trafficker seeking to buy drugs in Colombia and transport them out of the Cartagena airport to the United States. Through various intermediaries, Vargas met Aguas, a patrol-level officer in the CNP, who reportedly "had a setup in the air, on land, and on the water." App'x 90. Aguas represented to one of these intermediaries, who testified at trial, that he had worked in anti-narcotics, suggesting to her that "he had knowledge of the security protocols for detecting cocaine in the airport." App'x 94.

In May 2021, Vargas met Aguas in Cartagena at a meeting that Vargas believed would involve a "colonel in the drug enforcement division" of the CNP. App'x 236. At the meeting, however, Aguas appeared alone; he told Vargas that he worked closely with his boss, a colonel. Aguas said he had his "own group" and would handle the logistics and security of the cocaine deal, App'x 103, but Vargas insisted on meeting with Aguas's boss.

That's where Roldan came into the picture. After Vargas pressed to meet with a higher-ranking CNP official, Aguas brought Roldan to a May 26, 2021, meeting with Vargas to discuss a plan to send cocaine through the Cartagena airport to Puerto Rico and, ultimately, New York. Aguas told Vargas that Roldan

5

was a CNP major and Aguas's boss. During the meeting, Roldan emphasized that the merchandise should be stored in a warehouse controlled by Roldan's team before it was loaded onto the plane. Roldan told Vargas that he would "delegate" the logistical aspects of the operation to Aguas, but that he was "in charge of everything" related to "personnel" and the "police end of things" at the airport. App'x 128. Roldan emphasized that Aguas was his right-hand man, with whom he had worked for seven years.

At that meeting, Aguas set a price of $2,300 per kilogram of cocaine to facilitate the flight. Vargas asked whether Roldan would want payment in Colombian pesos or American dollars. Roldan responded, "[w]hichever way," before Aguas clarified that payment should be made in dollars. App'x 411–12. Toward the end of the meeting, Vargas placed $6,000—provided to him by the DEA—in front of Roldan as "an advance." App'x 143–44. Roldan handed the money to Aguas.

Vargas doubted that Roldan was actually a police major. He testified that Roldan's "uniform" appeared inconsistent with that of a police major, describing it as "frayed," "in very bad condition," and "missing some insignia," and he explained that he came to refer to Roldan as "Mayor Falso," or "Fake Major." App'x 255–56, 300.

After the May 26 meeting, Vargas was introduced to a cocaine supplier. At the direction of the DEA, a confidential source who purported to work for Vargas toured the supplier's cocaine laboratory and sent photographs of the laboratory to Vargas, who in turn forwarded the images to Aguas and Roldan.

On June 18, 2021, Vargas met again with Roldan, Aguas, and others. Vargas informed Roldan and Aguas that he had agreed to buy one thousand kilograms of cocaine from the supplier, and they discussed the details of the scheme to transport the drugs through the Cartagena airport. Aguas took the lead, and Roldan spoke occasionally. For example, when Vargas asked Roldan to confirm that the price for his services remained $2,300 per kilogram, Roldan responded, "Yes, sir." App'x 287.

On June 29, 2021, Aguas (without Roldan) met with Major Victor Alfonso Torres Valero ("Torres"), who led an anti-narcotics unit in the CNP.[1] Aguas told Torres that he had received information from a civilian source indicating that an airplane would be departing from Cartagena to Central America carrying narcotics. He did not disclose his meetings with Vargas, and when Torres asked him if he would be interested in acting in an undercover capacity, he said he was

---

[1] Torres did not testify at trial, but by stipulation, the parties read to the jury a statement reflecting Torres's expected testimony.

not. Torres said he would relay the tip to the DEA, and if the DEA was interested, it would organize the seizure of the drugs and pay Aguas's informant. Torres instructed Aguas not to "do anything with the information on his own." App'x 198. Ultimately, after a brief meeting with Aguas and the purported civilian source, the DEA declined to work with the source.

On September 9, 2021, Vargas messaged Roldan through WhatsApp, attaching photographs of a three-kilogram sample of cocaine he had purchased from the supplier and wrote that he had ordered 1,000 additional "boxes," or kilograms. App'x 310. Vargas then asked to speak with Roldan by phone. During the ensuing call, Vargas asked whether Roldan had spoken to Aguas about the plan. Roldan responded that Aguas was "keeping [him] up to speed." App'x 312. When questioned, Roldan assured Vargas that he could be trusted and invited him to come with him to the anti-narcotics base. The call concluded with Vargas confirming that Roldan preferred to be paid in U.S. dollars.

That was Roldan's last communication with Vargas. On February 19, 2022, Aguas and Roldan were arrested in Colombia pursuant to provisional arrest warrants requested by the United States. Roldan was extradited to the United States in October of 2022.

In addition to the above evidence, the government called Juan Ayala, an investigator for the Office of the Attorney General of Colombia. Ayala testified that he was familiar with "how police personnel records and undercover-related records are maintained." App'x 345. He explained that he had reviewed records from eight Colombian law enforcement agencies and did not find any records showing that either Roldan or Aguas had engaged in undercover work with those agencies at any point in their careers. He also did not receive "any records reflecting a seizure" of $6,000 by either Roldan or Aguas on May 26, 2021. App'x 346–47. According to Ayala, had Roldan and Aguas conducted such a seizure, they would have been required to report it, and he would have found a related record.

### B. Defendant's Evidence

Roldan's defense was that he never intended to facilitate drug trafficking to the United States; rather, he said, he thought he was participating in an operation designed to set up a seizure of the drugs by the CNP anti-narcotics unit. He testified as follows.

Roldan was a patrolman with the CNP. He worked as a horse-mounted officer in rural areas in Colombia. In April 2021, Roldan met Aguas when Aguas

was assigned to the same "Banana Zone"[2] commission as Roldan, and Roldan noticed that Aguas appeared to be "better off financially" than other patrol-level officers. App'x 386–88. Aguas had a car, owned his weapon, and had higher-quality work gear. When Roldan asked about this, Aguas explained that he worked at the anti-narcotics base. Aguas reportedly said:

> I have a source who gives me drug information, and I provide that information to my bosses at the anti-narcotics unit. My bosses speak with the DEA agents, and all of us work together with that information, and then we carry out the seizure. After the seizure is carried out, then they pay a reward for that information.

App'x 389. Aguas explained that his source, who was the direct recipient of the reward, would pay Aguas a percentage. Roldan testified that he was aware the CNP paid rewards for information leading to drug seizures.

One day when they were working, Aguas told Roldan that he had information from a source that a Mexican trafficker (that is, Vargas) wanted to move drugs through the Cartagena airport. Aguas said he had spoken with his bosses at the anti-narcotics base and described a plan to persuade Vargas to place the drugs in a warehouse known to Aguas's superiors, after which the drugs would be seized. Aguas explained that he had already met with the Mexican

---

[2] Roldan testified that the Banana Zone is an "intense" region "with many banana trees" located in Colombia's Magdalena department. App'x 379.

(Vargas) and that Vargas had asked to meet Aguas's boss before committing to a deal. He asked Roldan to "pretend to be Aguas'[s] boss and tell the Mexican that [he] was authorizing Aguas to do whatever was needed." App'x 392. Roldan testified that Aguas said he would receive a portion of the reward, up to $7,000. Roldan further testified that Aguas brought him to the CNP's anti-narcotics base so Aguas could use the bathroom. They were admitted without a search, the staff at the base knew Aguas, and Aguas entered a room with a key he possessed.

Roldan described his participation in the various communications proven by the government as efforts to further the seizure plan Aguas had described. So, for example, during the May 26 meeting when Roldan told Vargas and others that he was Aguas's boss, he understood that he was there to convince Vargas to trust Aguas and to go through with a plan to place drugs in warehouses where they could be seized. When Roldan referred to staff throughout the Cartagena airport as "my people," App'x 409, he was trying to convince Vargas that he was a major; he did not, in fact, control anyone at the airport. And when Vargas handed Roldan money at the end of that meeting, he passed it along to Aguas because the plan as Roldan understood it did not include taking any money. In fact, Roldan received none of that $6,000 payment from Vargas.

11

Roldan testified that by the time of the June 18 meeting, he had completed his term patrolling alongside Aguas in the Banana Zone. When Aguas called to ask him to return to Cartagena for another meeting, he was hesitant, in part because he didn't have appropriate clothing. Aguas sent him money to buy civilian clothes, loaned him a watch, and gave him some cologne. Aguas also gave Roldan a password-protected cell phone with one contact listed in the WhatsApp account by the name "Mexi," presumably short for "Mexican," meaning Vargas. App'x 417. Vargus sent photos to that account shortly before the meeting, apparently to validate that the person with that phone was really Roldan.

Roldan's purpose at that meeting was to give Vargas "more trust" so that he would deliver the drugs that would be seized. App'x 417. With respect to the discussion at that meeting of Vargas's advance payment, Roldan testified that he understood Aguas had arranged with his boss at the anti-narcotics unit to allow him to receive that money. After the meeting, Roldan returned to Aguas the phone Aguas had given him. Aguas then took Roldan to meet two purported anti-narcotics unit officers who were responsible for Roldan's protection, which enhanced Roldan's confidence that Aguas was telling him the truth.

Roldan testified that he received no updates from Aguas until September 2021. At that time, Roldan was working at the Metropolitan Stadium where the

12

Colombian national football team was playing, when Aguas called him and asked him to pick up a call from Vargas so that Vargas could hear his voice. Because Roldan no longer had the phone that Aguas had given him, Aguas instructed Roldan to delete the WhatsApp account from his personal phone and reinstall the application with a number and security code associated with the fictitious major that he impersonated. Using information that Aguas gave him, Roldan then messaged Vargas and invited him to call.

During Roldan's brief conversation with Vargas, he assured Vargas that Aguas had kept him "up to speed," even though Aguas had not updated him since June. App'x 432. In response to Vargas questioning whether he could trust Roldan, Roldan invited Vargas to go to the anti-narcotics base. He did not actually work in an anti-narcotics base, but Aguas had told him to say that if Vargas expressed doubts about Roldan. After the call, Roldan uninstalled the new WhatsApp account and reinstalled his own on his telephone. That was his last communication with Vargas before his arrest.

*C. Summations*

In closing argument, Roldan's counsel emphasized that Roldan never intended to send drugs to the United States; rather, he intended to seize them in Colombia. Roldan was a lifelong rural patrolman who had falsely posed as a high-

ranking major in the CNP, and the government provided no evidence that he was capable of moving large quantities of drugs through the Cartagena airport. He had never even worked in an airport unit or in Cartagena.

As to Roldan's intent, his counsel pointed out that Aguas took Roldan to the anti-narcotics base, and the two met with an anti-narcotics officer after the June 18 meeting—both facts that reinforced Roldan's belief, counsel urged, that he was engaged in an anti-narcotics-trafficking effort. He reminded the jury that Aguas had reported to Major Torres that he had a civilian source who had provided information about a plane that would be departing from Cartagena with narcotics inside, and that Aguas and his source did meet with the DEA—evidence that suggests that, just as he told Roldan, Aguas was trying to set up a seizure with his anti-narcotics unit and the DEA. And counsel highlighted Roldan's focus in the meetings with Vargas on the need to put the drugs in a warehouse—a necessary step to facilitate a seizure.

For its part, the government argued that Roldan "made [his testimony] all up" and that "there was no undercover operation." App'x 537. The government emphasized that Colombia has established procedures governing its undercover operations. Its witness, Ayala, "scoured" Colombian governmental records "for any shred of evidence that [Roldan] or Jose Aguas" had worked "in an undercover

14

capacity" and found "[a]bsolutely nothing."  App'x 514.  The government also stressed that "there were no records or reports of the $6,000" provided by Vargas at the May 26 meeting, suggesting that Roldan and Aguas kept the money and never reported it.  App'x 537.  As the government put it: "Real undercover officers don't keep money they seize from purported drug traffickers.  They file it in evidence.  They file reports on it.  But none of that occurred here." *Id.*

## II.     Pretrial Motion and the Excluded Evidence

The central issue in this appeal is whether the district court erred in excluding certain proffered evidence from the trial.[3]  Before trial, the government moved to exclude evidence concerning Aguas's prior involvement with the CNP's anti-narcotics unit, while the defense sought to introduce that same evidence.  The contested evidence consisted of statements of CNP Major Torres that were recorded in the government's interview notes.[4]  Torres was unavailable to testify, and given the circumstances surrounding his unavailability, the parties agreed to

---

[3] Because we vacate Roldan's conviction on the basis that the district court did exceed its discretion in excluding the statement at issue and that the error was not harmless, we do not address Roldan's arguments regarding other evidentiary rulings, his challenge to the jury charge, or his challenge to his sentence.

[4] Two Assistant United States Attorneys and two agents from the DEA participated in the interview, along with an interpreter.

admit the government's notes reflecting the substance of Torres's expected testimony to the extent the anticipated testimony would be otherwise admissible.

As relevant here, the admissibility of two of Major Torres's statements was contested. First, the defense sought to introduce Major Torres's statement that, following the May 26, 2021, meeting, Aguas informed Major Torres that he had a civilian informant with information about a plane planning to depart from Cartagena carrying narcotics. The government moved to exclude this statement as inadmissible hearsay.

Second, the defense sought to introduce Major Torres's statement that Aguas had twice previously given information to the Major's subordinates leading to successful cocaine seizures. The government moved to exclude this statement on the basis that it constituted impermissible propensity evidence under Federal Rule of Evidence 404(b).

The district court denied the government's motion with respect to the first statement. The court explained that the defense offered the evidence not for the truth of the matter asserted but rather for "the *fact*" that Aguas told Major Torres there was a plane planning to leave Cartagena with drugs, which made it "somewhat more likely that he told [Roldan] that he was trying to facilitate the seizure (instead of helping to export) the drugs"—evidence bearing on Aguas's

16

state of mind, which, the court said, "in turn goes to [Roldan's] state of mind."

Spec. App'x at 5–6.

The district court granted the government's motion to exclude the second statement—that Aguas had provided tips leading to prior drug seizures. The court wrote, without further elaboration, that it did so "largely for the reasons stated in the government's motion." Spec. App'x at 4.[5] Roldan's challenge to this latter ruling is at the center of this appeal.

## DISCUSSION

We review a district court's evidentiary rulings with deference to the district court. *See United States v. Desposito*, 704 F.3d 221, 233 (2d Cir. 2013). A district court exceeds its discretion where a ruling is based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *United States v. Barret*, 848 F.3d 524, 531 (2d Cir. 2017).[6] Even where a court errs, "evidentiary rulings are

---

[5] The district court suggested during the oral argument on the parties' respective pretrial motions that the statements were hearsay insofar as the Major lacked personal knowledge and was repeating what some other unidentified person told him. The government did not make such an argument in its pretrial motion, and does not press it on appeal, for good reason. The record does not indicate how the Major knew about Aguas's prior coordination with his subordinates on two occasions and is entirely consistent with the possibility that the Major was aware of Aguas's efforts through records regularly kept by his department. Fed. R. Evid. 803(6).

[6] In quotations from caselaw, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

17

subject to harmless error analysis." *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009).

To prove that Roldan was guilty of the charged conspiracy, "the government must demonstrate that [he] possessed the specific intent to commit the offenses that were its objects." *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014). Thus, if the jury concluded that Roldan truly believed he was participating in a scheme to identify and seize narcotics, rather than to distribute or export them to the United States, he would lack the criminal intent required for conviction—even if he was acting improperly, unethically, or even illegally in some other respect.

On appeal the government argues the district court properly excluded the evidence under Federal Rules of Evidence 404(b) and 403. We disagree. We conclude that (1) the excluded evidence was relevant because it tended to corroborate Roldan's account of critical conversations with Aguas bearing on Roldan's state of mind, (2) as such, the statement did not constitute propensity evidence and was improperly excluded, and (3) the error was not harmless.

## I.     Relevance

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Roldan's defense hinged almost entirely on the jury crediting his testimony that Aguas told him—and he believed—that the purpose of their operation was to set up a law enforcement seizure of the drugs. Roldan did not dispute that he participated in meetings and communications about exporting cocaine. Instead, he maintained that he lacked the requisite criminal intent because—based on Aguas's representations—he believed those communications were part of an effort to generate information that would lead to a seizure that would, in turn, yield financial benefits for Roldan. Roldan's stated belief stemmed in large part from the conversation in which Aguas described to him Aguas's prior work with the CNP's anti-narcotics unit and the financial rewards Roldan understood that Aguas received for providing tips that led to successful seizures.

The excluded evidence—that Aguas had twice provided information to the CNP's anti-narcotics unit leading to successful drug seizures—tended to corroborate Roldan's testimony that Aguas described to Roldan his past practice of giving the CNP information leading to drug seizures and then receiving a

19

portion of the reward money allocated to his sources. The fact that Aguas had, in fact, facilitated two seizures made Roldan's claims that Aguas had described to him facilitating such seizures more credible.

The inferential chain here is even stronger than the one we recognized in *United States v. Detrich*, 865 F.2d 17 (2d Cir. 1988), as supporting admission of challenged evidence. In that case, Detrich was found with narcotics concealed in the shoulder pads of a wedding suit when he arrived in New York on a flight from India. *Id.* at 18. He told law enforcement officers that the suit had been given to him by an acquaintance in India to deliver to a relative in the United States who was getting married the following month. *Id.* The defense sought to introduce a written statement that relative gave when he was apprehended at the airport, where he had gone to collect Detrich and the suit. In that statement, the relative said that he was planning to get married the following month. *Id.* at 19. The district court excluded the statement as hearsay. *Id.*

We reversed and held the evidence admissible because it tended to corroborate Detrich's account of his conversation with his acquaintance in India. *Id.* at 21. Evidence that the relative told the police he had marriage plans made it more likely that the acquaintance described those plans to Detrich, as Detrich claimed, thus enhancing Detrich's credibility with respect to his claim that he

20

thought he was doing an innocent favor for his acquaintance in India by delivering a wedding suit to the relative. *Id.* Significantly, we specifically noted that the relative's statement was admissible "*without regard to the truth*" of the statement—that is, even if the relative was not, in fact, planning to marry—because what mattered was not whether the relative actually planned to get married but whether Detrich believed that he did. *Id.* (emphasis added).

As in *Detrich*, the excluded testimony here tends to corroborate Roldan's testimony as to what Aguas told him. It thus bears on Roldan's intent by establishing a stronger basis for his stated belief that he and Aguas were engaging with Vargas for the purpose of setting up a drug seizure. The evidence, therefore, tends to make it more probable that Roldan believed he was assisting a law-enforcement seizure rather than participating in a drug-trafficking conspiracy, rendering it relevant under Rule 401. Here, there is no dispute that Aguas did, in fact, facilitate two prior successful drug seizures, so the corroborative effect of the evidence is even stronger than in *Detrich*.

## II. Admissibility Under Rule 404(b)

Thus understood, the excluded evidence does not run afoul of Federal Rule of Evidence 404(b). Under that Rule, otherwise relevant evidence of "any other crime, wrong, or act is not admissible to prove a person's character in order to

21

show" that the person acted in accordance with that character "on a particular occasion." Fed. R. Evid. 404(b)(1). Such evidence may, however, be admitted for other purposes, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The government argues that evidence of Aguas's prior involvement in successful drug seizures by the CNP would invite the jury to infer that Aguas acted in conformity with that prior good conduct in this case, in violation of Rule 404(b)'s prohibition on propensity evidence.[7] The government relies on a decision in which we affirmed the exclusion of evidence the defendant offered of his prior lawful conduct to suggest he acted lawfully on the charged occasion. *See United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011).

That case is inapposite. The theory of relevance outlined above does not rest on any inferences about Aguas's actual intent or plan. Instead, the evidence is

---

[7] As to the government's argument on appeal that the evidence was unduly prejudicial under Rule 403, the district court did not conduct a Rule 403 analysis, and the government's pretrial motion seeking exclusion of this component of the Torres statement relied solely on Rule 404(b). We decline to affirm the district court's evidentiary ruling on a basis the government did not raise before the district court and the district court did not address. *United States v. Figueroa*, 548 F.3d 222, 230 (2d Cir. 2008) ("Because we review a Rule 403 decision for abuse of discretion, and since the district court did not exercise its discretion on this basis or engage in a balancing process that we can review, we have no occasion to decide whether the evidence was properly excluded under the Rule.").

relevant to corroborate Roldan's testimony about a conversation he had with Aguas that bears directly on *Roldan's* state of mind. That is not a propensity-based inference, and Rule 404(b) does not bar the evidence.[8]

### III. Harmless Error

Under Federal Rule of Criminal Procedure 52, any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). We will uphold a conviction notwithstanding an evidentiary error only if it is "highly probable that the error did not affect the verdict." *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003); *see also Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946) (explaining that reversal is required unless the court is sure that the error "did not influence the jury, or had but very slight effect"). In assessing harmlessness, we consider, among other factors, the importance of the excluded evidence to the defense,

---

[8] Roldan argues in the alternative that evidence that Aguas previously set up drug seizures is admissible under Rule 404(b) to show Aguas's intent, motive, and plan. Roldan points to *United States v. Aboumoussallem*, in which we explained that evidence that a third party had a practice of duping people to act as couriers without their knowledge would be admissible under Rule 404(b) to support a defense that a third party likewise duped the defendant. 726 F.2d 906, 911–912 (2d Cir. 1984) ("[R]isks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense" and, "[i]n such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense."). Because we conclude that the evidence was relevant to corroborate Roldan's testimony regarding Aguas's statements to him, we need not consider this alternative theory of admissibility.

whether the evidence was cumulative, and the overall strength of the government's case. *See United States v. Litvak*, 808 F.3d 160, 184 (2d Cir. 2015); *United States v. Oluwanisola*, 605 F.3d 124, 134 (2d Cir. 2010). Of the standard considerations, the "strength of the government's case is the most critical factor." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009). And we have long recognized that an "[e]rror going 'to the heart' of a critical issue is less likely to be harmless." *United States v. Forrester*, 60 F.3d 52, 64–65 (2d Cir. 1995); *United States v. Blum*, 62 F.3d 63, 69 (2d Cir. 1995) (same). The government bears the burden of proving that an evidentiary error was harmless. *United States v. Zhong*, 26 F.4th 536, 558 (2d Cir. 2022).

Applying these principles, we conclude that the government has not carried its burden of showing that the district court's error was harmless. The excluded evidence was central to the defense. The main dispute at trial was whether Roldan intended to participate in a drug-trafficking conspiracy or instead believed he was assisting in a law-enforcement seizure. Evidence that Aguas had, in fact, provided information leading to successful drug seizures tended to corroborate Roldan's testimony as to what Aguas told him, and thus bore directly on the jury's assessment of his credibility and state of mind. *See Detrich*, 865 F.2d at 21–22 (holding an evidentiary error not harmless where the excluded evidence

24

corroborated the defendant's testimony on the central issue of intent). In fact, the evidence was relevant to Roldan's state of mind for the same reason as the evidence of Aguas's report to Torres about an anticipated shipment of drugs through the Cartagena airport—evidence the district court did admit.

Further, the government's case at trial on the element of intent was not overwhelming. Roldan's conduct, including his emphasis during the meetings with Vargas on the need to deposit the drugs in a warehouse before moving them through the airport, was arguably consistent with an intent to participate in a scheme to set up a drug seizure and reap financial benefits as a result. And the government offered no evidence that Roldan, a low-level patrol officer on a rural assignment, had any experience at the Cartagena airport, connections with anyone at the airport, or the capability to pass massive quantities of cocaine through that airport without detection.

Nor was the evidence merely cumulative. It is true that the jury heard evidence that Aguas approached Major Torres with information about a potential shipment moving through the airport, which tended to support Roldan's defense that his involvement in the scheme was to set up a seizure of the drugs before they left the country. That evidence, however, also established that the DEA declined to work with Aguas and instructed him not to take independent action. As a

result, the admitted evidence reinforced the government's narrative at trial that Aguas lacked authorization to conduct an undercover operation in connection with a shipment through the Cartagena airport. By implication, this evidence undermined Roldan's testimony that Aguas told Roldan that he was acting with the blessing of the anti-narcotics unit.

The excluded evidence served a distinct and critical function. Based on the excluded evidence, the jury could reasonably have concluded that Roldan did not actually believe he was participating in an approved undercover operation but did believe he was helping to set up a CNP seizure of drugs that would enable him to reap a portion of the reward money. The excluded evidence would have bolstered that defense theory by supporting Roldan's testimony that Aguas reported facilitating seizures and securing part of the reward money in the past.

The government capitalized on the evidentiary gap created by the district court's ruling. In both its presentation of evidence and its closing argument, the government emphasized that neither Aguas nor Roldan had ever been authorized to conduct *undercover* seizure work for the CNP. Although that assertion was factually accurate, it was materially incomplete because it obscured the alternative defense theory: that Roldan sought to set up a CNP seizure so he could benefit

from the reward money, even if he was not conducting an approved undercover action.

Because intent was the central disputed issue at trial, and because the excluded evidence bore directly on the credibility of Roldan's asserted understanding of the operation, there is a substantial possibility that the excluded evidence would have changed the jury's assessment of Roldan's intent. Under these circumstances, we cannot conclude it is "highly probable that the error did not affect the verdict." *Dukagjini*, 326 F.3d 45 at 61.

For the above reasons, we **VACATE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.